UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JUDITH SANDRINE DIKAMBI,

                 Plaintiff,

       v.

CITY UNIVERSITY OF NEW YORK and
DR. CARLTON J. ADAMS,

                 Defendants.

19-CV-9937 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

       Plaintiff Judith Sandrine Dikambi ("Dikambi") brings this employment discrimination action against her employer, the City University of New York ("CUNY") and a professor at CUNY's John Jay College of Criminal Justice, Carlton Jama Adams ("Adams"). Dikambi alleges that she was subjected to sexual harassment and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the New York City Human Rights Law (the "NYCHRL"). The Court previously dismissed numerous causes of action and Defendants each now move for summary judgment on Dikambi's two remaining claims, namely, her Title VII claim against CUNY, and her NYCHRL claim against Adams. For the reasons set forth below, CUNY's motion is granted, and Adams' is denied.

## BACKGROUND[1]

       Dikambi, who identifies as a "black female of African national origin," is a CUNY employee who has worked at the John Jay College of Criminal Justice (the "College") since August

---

[1] The Court draws the following facts from the parties' 56.1 Statements of Fact ("56.1") and supporting documents, which are undisputed unless otherwise noted.

2005. CUNY 56.1 ¶ 1. From 2005 until 2013, she was the coordinator of Undergraduate Studies at the College, and from 2013 until January 2017, she worked at the College's Office of International Studies and Programs. Adams 56.1 ¶¶ 7–8, 12. Adams is an African American man who was, at all relevant times, a professor in the Africana Studies Department at the College. CUNY 56.1 ¶ 3.

Dikambi and Adams met in 2006 at a reception for Black faculty and administrators. Adams 56.1 ¶ 10. In the subsequent years, Dikambi came to consider Adams a friend and a mentor and "generally kept" him "abreast of what [she] was going through" professionally and personally. CUNY 56.1 ¶ 4. Dikambi described Adams as "like a counselor to [her]," and because he had worked at the College longer than she had, "when there was a situation at the college that [she] wasn't sure how to handle, [she] sought his guidance." *Id*. Dikambi had meetings with Adams in his office at the college, ate lunch with him off campus "many times," and introduced Adams to her son more than twice. *Id.* ¶ 5. Dikambi and Adams would also frequently discuss her son's behavioral problems and which school to send him to, as well as her marriage and her relationships with her mother and her sister. *Id.* ¶ 6. Until 2015, Adams sent Dikambi birthday wishes and cards every year, as well as gifts for her son. *Id.* ¶ 9. Dikambi also sought Adams' assistance in connection with her coursework to obtain a master's degree in public administration at the College. *Id.* ¶ 8.

According to Dikambi, starting in about 2006, Adams made frequent sexual advances towards her, consisting of sexual comments, touching her breast, her behind, and her body while in his office or her office. *Id.* ¶ 11. In her deposition, Dikambi testified that "each time" Adams touched her, "[she] touched him back." *Id*. ¶ 12. Dikambi alleges that Adams made "sexual" and "sexist" comments to her, consisting of comments about her gender and weight, including telling

2

her she had a "fat ass" and that her facial lips were "juicy." *Id.* ¶ 13. In response to these comments, Dikambi would "just roll [her] eyes at him" and say, "why are you talking that way." *Id.* Dikambi also claims that "one time," Adams made a "xenophobic" comment when he said she was acting a certain way because she is a "fucking African." *Id.*

Dikambi testified that in December 2014, she went to Adams' home to work on a paper related to her work towards her degree. Pl. 56.1 Resp. (CUNY) ¶ 110; Dkt. 154 ("Klein Decl.") Ex. A ("Dikambi Transcript") at 77–84. According to Dikambi, they worked on the paper for a couple of hours before going to Adams' bedroom. Pl. 56.1 Resp. (CUNY) ¶¶ 112–13. Dikambi asserts that he then undressed her and that she "froze" and felt "coerced" as he began to perform oral sex on her. Pl. 56.1 Resp. (Adams) ¶ 137. She testified that she then told him that she was "sick" and said "no," a contention Adams disputes. *Id.* ¶ 138. Dikambi further claims that Adams "put his penis in [her]" and that she twice said "I don't want to" before telling him "I want to go, I don't want this." Dikambi Tr. at 96–98. In his deposition, Adams did not dispute he and Dikambi had intercourse when she visited his apartment in December 2014, but insisted that their interaction was consensual. Klein Decl. Ex. G ("Adams Transcript") at 53–54.

Dikambi testified that she began distancing herself from Adams in 2015 or 2016. Dikambi Tr. at 49, 50, 54-55. In April 2016, at an awards banquet for African students, Adams pulled Dikambi's hair in front of students and staff and told the room of predominantly black women that "some of us still have our natural hair." Adams 56.1 ¶¶ 29, 31. Dikambi pulled Adams' hair back as she went to receive an award at the event. *Id.* ¶ 30.

In late 2016, Dikambi was told the work she had been performing was being transferred to another division. CUNY 56.1 ¶ 15. She sought Adams' assistance, asking him whether he would help her get a job in the Africana Studies Department, *id.* ¶¶ 16–18, where Adams was the

3

department chair, Pl. 56.1 Resp. (CUNY) ¶ 103. Adams worked with the College's Office of Human Resources ("HR") to prepare a new job description for Dikambi's position. CUNY 56.1 ¶ 19. Dikambi began working as an administrative assistant in the Africana Studies Department in January 2017, reporting to Adams. *Id.* ¶ 20. Dikambi testified that Adams "continued" making sexual comments to her after she began working in the Africana Studies Department. Dikambi Tr. at 124. Adams again disputes this contention. Adams 56.1 Resp. ¶ 163.

According to CUNY, "[a]t no time—either before, during or after Plaintiff was working the Africana Studies Department—did Adams have the power to fire or demote Plaintiff, reduce her salary or benefits, change Plaintiff's Job Description or transfer Plaintiff to another position." CUNY further contends that "the most Adams could have done" to affect her position "was recommend or make a request to the College's HR department[.]" *Id.* ¶ 21. Dikambi disputes that characterization, asserting that Adams "had the power to alter the terms and conditions of her employments [sic], including but not limited to, creating a hostile work environment, discouraging complaints about his behavior to Human Resources, and manufacturing substandard performance evaluations and other actions that would form the basis of an unwarranted termination." Pl. 56.1 Resp. (CUNY) ¶ 21.

At the end of May 2017, Dikambi made her first of a number of complaints about Adams' conduct, beginning with allegations about Adams' use of profanity and his warnings about her performance at work, Pl. 56.1 Resp. ¶¶ 145, 152, and culminating with her claim in October 2018 that Adams had "put his hands on her body," "felt her up [on] more than one occasion," and performed oral sex on her nearly four years earlier. CUNY 56.1 ¶ 63. On May 24, 2017, she met with Donald Gray, the Labor Designee and College Ethics Officer in the College's Office of Legal Counsel and played an audio recording she made of Adams, though she acknowledges that the

recording was "indecipherable." Pl. 56.1 Resp. (CUNY) ¶ 146; Dikambi Tr. at 334–35. According to a transcript of the recording Dikambi produced, Adams had reprimanded her for her work, saying, "You don't want to give up data and information that I'm asking you for. You don't want to start working on big projects and giving regular updates … I want certain things from you. They're not hard for you to do." Dikambi 56.1 (CUNY) ¶ 145. Gray testified, however, that Dikambi did not register a complaint with him before May 31, 2017. Klein Decl. Ex. H at 29:20–30:5.

Then, on May 30, 2017, Dikambi recorded a conversation between Adams and her in which Adams said, among other things, "I have one thing to say to you again. All I have to do Sandrine is treat you properly and you are fucked. Try and understand that. All right? I don't have to do anything for you. And, if I don't do anything for you, you are fucked." CUNY 56.1 ¶ 22. On May 31, 2017, Dikambi complained to Gray about Adams' "outburst." *Id.* ¶ 23. Gray directed Dikambi to speak immediately with the College's HR Director, Raj Singh, which she did. *Id.* ¶¶ 23, 24. Singh listened to the recording Dikambi had made of Adams and told her to go home for the day. *Id.* ¶¶ 23–25. On June 5, 2017, Singh convened a meeting also attended by Dikambi, Adams, Gray and Jessica Gordon Nembhard, the incoming chair of the Africana Studies Department, during which the participants discussed whether Dikambi would be satisfied working in the department under Nembhard, and Singh directed Adams to apologize for his use of profanity. *Id.* ¶¶ 29, 30. Adams apologized, and Dikambi then took medical leave from June 7, 2017 to July 30, 2017. *Id.* ¶¶ 29, 32.

On July 31, 2017, the day she returned from medical leave, Dikambi sent an email to HR and the College Department of Public Safety stating that she had been subject to "a hostile and hyper-dysfunctional work environment," in that Adams "consistently demeaned [her] on a

personal and professional level" and "even made xenophobic and sexist remarks," although she did not specify what those remarks were. *Id.* ¶¶ 33, 34; Klein Decl. Ex. J. Three different offices— HR, the Department of Public Safety, and the Officer of Compliance & Diversity ("Compliance & Diversity")—responded to Dikambi's complaint. The Department of Public Safety interviewed Dikambi on August 10, 2017, during which she was asked if she needed a security escort or believed that Adams would ever physically harm her, to which she responded "no." *Id.* ¶¶ 40, 41.

Dikambi also met with the Silvia Montalban, the Director of Compliance & Diversity on August 9, 2017, and described the incident in 2016 when Adams pulled her hair at a college banquet. *Id.* ¶ 48. She told Montalban that when Adams got to the microphone, he said, "some of us still have natural hair," but that she also pulled his hair when she went to the microphone. Dkt. 153, Declaration of Gabriela Leal ("Leal Decl."); Klein Decl. Ex. A at 1–2; Pl. 56.1 Resp. ¶ 48. Dikambi did not tell Montalban that Adams had made any sexual advances towards her but said that he had made demeaning and sexist comments, including "I don't like this elephant. This is an ugly elephant. I'm not talking about you though," and, "[t]hat lipstick you have on does nothing for you." *Id* at 3. Montalban told her to file a "formal written complaint" and supplied her with a complaint form. CUNY 56.1 ¶ 50. On September 20, 2017, Dikambi met with two CUNY officials who offered her an "immediate transfer" to a similar position in the Political Science Department, which she "happ[ily]" accepted. *Id.* ¶¶ 35, 37. Between her initial complaint and her transfer out of the Department, Dikambi had "very little interaction" with Adams and does not recall any inappropriate communications with him during that time. *Id.* ¶¶ 35, 36.

On October 31, 2017, HR Director Singh sent Dikambi a memo recounting Adams' apology on June 5, 2017 "for his inappropriate choice of words," as well as Dikambi's transfer to the Political Science Department. Klein Decl. Ex. M at 1. The memo also explained that Adams

had been warned that "there should be no retaliation on his part" and that Adams had "indicated his understanding and acknowledged that as his term as departmental chairperson came to a close there would be little if any need for future interaction with [Dikambi]." *Id.* at 2. Singh stated that "[b]ased on the foregoing, the College considers this matter closed." *Id.*

On February 9, 2018, Dikambi emailed Montalban to report an incident that occurred the previous day in which Adams had "handed [her] a piece of paper"—which she later said was a copy of a paper that Adams had assisted her with years earlier—and claimed that Adams had done so to "continue to pressure [her] and make [her] feel extreme discomfort." Leal Decl. Ex. A at 3; CUNY 56.1 ¶ 51. In her deposition, Dikambi testified that she was in her office with a student at the college when Adams dropped off the paper on February 8, 2018. Dikambi Tr. at 149. Montalban responded to Dikambi's February 9 email by sending her a new complaint form and meeting with her in person on February 22, 2018. CUNY 56.1 ¶ 52. On February 22, 2018, Dikambi filed a complaint form titled "Charge of Discrimination Form," checking boxes next to "Race or Color" and "Sexual Harassment." *Id.* ¶ 54. Dikambi indicated that she planned to share specific details, stating that she "will bring … xenophobic sexist remarks description that have occurred in past" and "will also be describing events from previous years," but did not specify those remarks or say that Adams had ever made sexual advances. *Id.* ¶ 55. The next day, on February 23, 2018, the College issued no-contact orders to Adams and Dikambi, which Adams signed on February 27, 2018 and Dikambi on March 1, 2018. *Id.* ¶ 57. Dikambi visited the Africana Studies Department five times in April 2018, notwithstanding the no-contact orders. *Id.* ¶ 58. In response, CUNY personnel cautioned her against going to the Department and advised her to observe the no-contact orders. *Id.*

On May 31, 2018, Gabriela Leal, then the Deputy Director of Compliance & Diversity, followed up with Dikambi about her February 22, 2018 complaint, informing her that a "formal fact-finding cannot take place until we have all documentation," and asking her whether she would submit information to complete the complaint that she had said would be forthcoming. *Id.* ¶ 59. Dikambi did not respond. *Id.* On September 18, 2018, Leal again reminded Dikambi that she had not submitted further information and asked her to do so by September 24, 2018. *Id.* ¶ 61. In a September 24, 2018 email to Leal, Dikambi submitted a follow-up complaint describing "sexual advances prior to [her] joining the Africana Department" in January 2017. *Id.* ¶ 62. CUNY scheduled a meeting with her on October 5, 2018, during which Dikambi described for the first time that Adams "put his hands on her body" and "felt her up," as well as that he had performed oral sex on her nearly four years earlier. *Id*. ¶ 63. Four days later, Leal and Montalban interviewed Adams regarding Dikambi's allegations and provided him with a notice of allegations. *Id.* ¶ 65. Leal conducted follow-up interviews with Dikambi and other individuals identified as witnesses in the subsequent days. *Id.* ¶ 66.

Leal completed her report on February 8, 2019, concluding that Dikambi's allegations that Adams had made unwanted sexual advances, subjected her to unwanted oral sex and groped her were not supported by the evidence. Leal Decl. Ex. A. at 18–19. The report did conclude, however, that Adams had pulled Dikambi's hair in April 2016, and between January 2017 and June 2017 had commented on her lipstick and told her that she was "acting like this because you are African." *Id.* at 20. The College directed Adams to participate in training, which he completed. CUNY 56.1 ¶ 72.

## PROCEDURAL BACKGROUND

On October 22, 2018, Dikambi filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), and on July 29, 2019, the EEOC mailed Dikambi a right-to-sue letter. Adams 56.1 ¶ 87. On October 27, 2019, Dikambi commenced this action, asserting eight causes of action. The Court dismissed Dikambi's claims on September 14, 2021 with the exception of her hostile work environment claim under Title VII against CUNY and her hostile work environment claim under the NYCHRL against Adams. CUNY then moved for reconsideration, which the Court denied. Dikambi filed a third amended complaint on November 12, 2021, which Adams and CUNY moved to dismiss largely on the same grounds as their motions to dismiss the earlier complaint. The Court denied both motions on June 24, 2022. Following the close of fact discovery, CUNY and Adams separately moved for summary judgment on the remaining claims against them. CUNY and Adams have also moved to strike or disregard Dikambi's Rule 56.1 counterstatements, and CUNY has moved to preclude Dikambi from relying on any evidence or testimony from her therapist.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. To survive summary judgment, the moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d

Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*.

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc*., 653 F.3d 156, 164 (2d Cir. 2011). "If there are cross motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." *Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am*., 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## DISCUSSION

### I.   Defendants' Motions to Strike or Disregard Dikambi's 56.1 Counterstatement

Adams and CUNY urge the Court to strike or disregard Dikambi's Rule 56.1 counterstatements because, according to Adams, the counterstatements "go[] well beyond a separate, short, and concise statement of additional material facts," and are instead "a lengthy narrative of Plaintiff's version of events[.]" Dkt. 197. Dikambi's 56.1 counterstatements to both CUNY and Adams are indeed lengthy, and she fails to support many of her assertions with adequate citations to the record. The Court declines, however, to take the severe sanction of striking her Rule 56.1 counterstatements in their entirety. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 397 (S.D.N.Y. 2015), (acknowledging that even though a party's statement was "redundant and contrary to the letter and spirit of Local Rule 56.1," striking the entire statement would be "too severe" a sanction), *aff'd*, 945 F.3d 83 (2d Cir. 2019). It will nonetheless disregard portions of Dikmabi's 56.1 counterstatements that contain conclusory, argumentative, irrelevant, speculative, or unsupported assertions. *See id.*

## II.  NYCHRL Claim Against Adams

Adams moves for summary judgment dismissing Dikambi's New York City Human Rights Law hostile work environment claim against him. That motion is denied.

### A.  Merits

The NYCHRL makes it unlawful for "an employer or an employee or agent thereof, because of the actual or perceived ... gender ... of any person ... to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." NYCHRL § 8-107(1)(a). The NYCHRL therefore provides for "individual liability of an employee regardless of ownership or decisionmaking power." *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012) (citation omitted). In determining whether a claim of hostile work environment survives summary judgment under the NYCHRL, "the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff 'has been treated less well than other employees because of'" his or her protected status. *Barounis v. N.Y.C. Police Dep't,* No. 10-CV-2631 (SAS), 2012 WL 6194190, at *9 (S.D.N.Y. Dec. 12, 2012) (quoting *Williams v. N.Y.C. Hous. Auth.,* 872 N.Y.S.2d 27, 39 (1st Dep't 2009)). "Under the NYCHRL, defendants' discriminatory conduct need not be 'severe or pervasive' to create an actionable hostile work environment." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012), *aff'd,* 713 F.3d 163 (2d Cir. 2013) (quoting *Williams*, 872 N.Y.S.2d at 39–41). Rather, "questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Id.*  While the NYCHRL "requir[es] an analysis more stringent than that called for under either Title VII or the State [Human Rights Law]," it is not "a general civility code" and "petty slights and trivial inconveniences" are not actionable under it. *Id.* at 30, 40–41.

There is sufficient evidence in the record to lead a reasonable juror to conclude that Adams "treated [Dikambi] less well than other employees because" she is a woman. *Barounis*, 2012 WL 6194190, at *9 (citation omitted). Dikambi testified that after they met in 2006, Adams "frequently" made sexual advances toward her, including unwanted touching and sexual comments. Dikambi Tr. at 117–18. Adams does acknowledge that he and Dikambi had a sexual encounter at his apartment in 2014 when she sought his assistance with an academic paper, but he insists the encounter was consensual. Adams 56.1 ¶¶ 71–72; Adams Tr. at 53–54. Dikambi testified that during their sexual encounter she said "I don't want to" and "I want to go," before he "said [she] could leave." Dikambi Tr. at 86, 90 96–98, 109. Adams also acknowledges that he pulled Dikambi's hair at an event in 2016 and said, "some of us still have our natural hair." Adams 56.1 ¶ 31. In addition, according to Dikambi, after being transferred to the Africana Studies Department in January 2017 where she worked directly with Adams, he made frequent comments about her appearance and weight. Dikambi Tr. at 120, 124, 127–129; Pl. 56.1 Resp. (Adams) ¶ 163.

"If a jury were to credit [Dikambi's] testimony," it could reasonably conclude that Adams' behavior "constituted more than 'petty slights or trivial inconveniences,' and that it was sexually-charged conduct" that subjected her to a different set of employment conditions because of her gender. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) (citation omitted) (reversing district court's finding of summary judgment for employer where plaintiff presented evidence that employees "made lascivious comments about women's outfits and bodies" and that she was subjected to "unwanted sexual attention").

Adams argues that summary judgment is warranted in part because his teasing and flirtation with Dikambi was mutual, testifying in his deposition, for example, that Dikambi herself engaged in sexual banter and commented on Adams' appearance, calling him "cute" and telling him she

"liked how [his] body looked." Adams 56.1 ¶ 25; Adams Tr. at 64. Adams also insists that that

their sexual encounter in December 2014 was consensual. *Id.* at 67. But as the Second Circuit has

made clear, the "[e]valuation of ambiguous acts is a task for the jury, not for the judge on summary

judgment." *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (citation omitted)

(reversing district court's grant of summary judgment on Title VII sexual harassment claims).

Dikambi has testified that Adams' sexual advances were unwanted, and that his comments about

her hair and her appearance were demeaning. "[W]hen, as is often the case in sexual harassment

claims, fact questions such as state of mind or intent are at issue, summary judgment should be

used sparingly." *Id*. at 178 (citation omitted).

### B.  Timeliness

Adams also argues that the Court may not consider alleged misconduct that occurred prior

to October 2016 consistent with the NYCHRL's statute of limitations. The Court disagrees. First,

any instances of Adams' alleged misconduct in the three years prior to the commencement of this

action are presumptively actionable pursuant to the NYCHRL's three-year statute of

limitations. N.Y.C. Admin. Code § 8–502(d); *see Bumpus v. N.Y. City Transit Auth*., 883 N.Y.S.2d

99, 109 n.3 (App. Div. 2009). Second, although "the Second Circuit has not yet resolved the

question of whether EEOC charges toll the statute of limitations for NYCHRL claims," the weight

of authority in this District holds that EEOC charges do toll NYCHRL claims. *Nixon* v. *TWC*

*Admin. LLC*, No. 16-CV-6456 (AJN), 2017 WL 4712420, at *2 (S.D.N.Y. Sept. 27, 2017)

(collecting cases); *see Sesay-Harrell* v. *N.Y.C. Dep't of Homeless Servs.*, No. 12-CV-925 (KPF),

2013 WL 6244158, at *12 (S.D.N.Y. Dec. 2, 2013).  Finally, under the NYCHRL, "as under Title

VII, hostile work environment claims … may be based on events outside the statute of limitations

period to the extent they constitute part of the same actionable hostile work environment practice,

and at least one act contributing to the claim occurs within the filing period." *Gutierrez v. City of New York*, 756 F. Supp. 2d 491, 501 (S.D.N.Y. 2010) (citation omitted).

Dikambi filed this action on October 27, 2019, and the underlying EEOC charge was pending between October 22, 2018 and July 29, 2019, Adams 56.1 ¶¶ 87, 88, tolling the limitations period for 280 days. Accordingly, any incidents of misconduct that occurred after January 20, 2016 are not time-barred.[2] Furthermore, the post-January 20, 2016 instances of alleged harassment could reasonably be considered along with the earlier incidents to be part of a "series of separate acts that collectively constitute one unlawful employment practice[.]" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (citation omitted) (explaining that, in the context of hostile work environment claims under Title VII, if "an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability"). The hair-pulling incident, for example, occurred in April 2016, and Dikambi testified that Adams "continued" making sexual and degrading comments to her after she began working in the Africana Studies Department in January 2017, including "talk[ing] about [her] lips" and "her weight." Dikambi Tr. at 128. Drawing all reasonable inferences in Dikambi's favor, those incidents, which were perpetrated by the same alleged harasser and all arguably tied to Dikambi's gender, are "sufficiently related" to Adams' prior alleged conduct so as to constitute part of the same hostile work environment. *McGullam v. Cedar*

---

[2] In support of his assertion that only allegations of misconduct that occurred after October 2016 should be considered, Adams relies on the Court's statement in its Opinion & Order on Adams' and CUNY's motions to dismiss the Second Amended Complaint that it would, for the purpose of those motions, "consider allegations dating back to October 2016 in its assessment of NYCHRL claims against Adams." Dkt. 79 at 15. There, the Court's analysis of the statute of limitations relied primarily on its conclusion that the February 8, 2018 incident when Adams visited Dikambi and dropped the paper he had previously worked on with her on her desk was "sufficiently related" to his alleged harassment so as to allege a continuing violation under Title VII, Dkt. 79 at 8–9 (citation omitted). Given the consensus among courts in this District that EEOC complaints toll the statute of limitations for NYCHRL claims, however, the Court also considers allegations of conduct that occurred prior to October 2016.

*Graphics, Inc.*, 609 F.3d 70, 77 (2d Cir. 2010) (discussing continuing violation doctrine under Title VII); *see, e.g., Williams v. New York City Dep't of Educ.*, No. 19-CV-1353 (CM), 2019 WL 4393546, at *10 (S.D.N.Y. Aug. 28, 2019) (finding that a "pattern of sexually harassing activity" constituted single unlawful employment practice under NYCHRL and Title VII); *Avila-Blum v. Casa de Cambio Delgado, Inc.*, 519 F. Supp. 2d 423, 429 (S.D.N.Y. 2007) (concluding that plaintiff's assertions of "regularly-occurring" sexual harassment before and after statute of limitations period constituted continuing violation). The Court may therefore properly consider Adams' pre-January 2016 conduct as part of Dikambi's NYCHRL claim.

In sum, in light of the numerous disputed questions of fact about Adams' conduct and the nature of his relationship with Dikambi beginning in 2006, and given that the existence of a hostile work environment "presents mixed questions of law and fact that are especially well-suited for jury determination," *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 605 (2d Cir. 2006) (citation omitted), the Court denies Adams summary judgment on Dikambi's NYCHRL claim.

### III.  Title VII Claim Against CUNY

Dikambi seeks to hold CUNY vicariously liable for Adams' conduct pursuant to Title VII under two theories: first, that because Adams was Dikambi's supervisor, CUNY is strictly liable for his alleged misconduct; and second, that CUNY is in any event liable for failing to adequately respond to Dikambi's complaints. Dikambi's efforts to hold CUNY liable for Adams' conduct fail.

### A.  Whether Adams was Dikambi's Supervisor

Dikambi first argues that CUNY is liable because Adams "subjected [her] to certain actionable conduct while he was her supervisor." Pl. Opp. to CUNY at 17. The Court disagrees.

An employer is presumptively liable for sexual harassment perpetrated by an employee's supervisor in violation of Title VII. *Redd v. New York Div. of Parole*, 678 F.3d 166, 182 (2d Cir.

2012). As the Second Circuit has made clear, however, an employee is a "supervisor" for the purposes of vicariously liability under Title VII only "when the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019) (quoting *Vance v. Ball State University*, 570 U.S. 421, 431 (2013)).

"The ability to … recommend discipline [is] not [a] tangible employment action[] within the meaning of Title VII," nor is the "ability to distribute daily tasks." *Murphy v. Wappingers Cent. Sch. Dist.*, No. 15 CV 7460 (VB), 2018 WL 1831847, at *7 (S.D.N.Y. Apr. 16, 2018) (citation omitted); *see Small v. Garland*, No. 18-CV-5659 (BCM), 2021 WL 1226979, at *20 (S.D.N.Y. Mar. 31, 2021) ("Neither assigning tasks outside the plaintiff's job duties, distributing daily work assignments, recommending discipline to superiors, nor controlling an employee's hours and assignments within their job description have been held sufficient to establish supervisor status."); *see also Vance*, 570 U.S. 421 (explaining that "the ability to direct another employee's tasks is simply not sufficient" to make one a supervisor). In *Bentley v. AutoZoners*, for example the Second Circuit considered whether a "sales manager" who allegedly harassed the plaintiff—who was a part-time sales associate—was the plaintiff's "supervisor" such that their employer was liable for his harassing conduct. 935 F.3d 76. Although the sales manager allegedly "threatened to cut [the plaintiff's] work hours, to send her home, and even to fire her," the court noted that "there [was] no evidence" that he was ever empowered to take those actions. *Id.* at 92. And notwithstanding the testimony of a company district manager that the sales manager "had the authority to discipline [the plaintiff] if the circumstances warranted it," the court concluded he was not her "supervisor"

for purposes of vicarious liability because he "could not … alter her hours, or change her compensation" and thus "cause [her] economic injury." *Id.*

Consistent with those principles, to raise a triable issue of fact as to Adams' status as a supervisor, Dikambi must adduce evidence showing that "[CUNY] had authorized [Adams] to do more than oversee her day-to-day performance of assigned tasks." *Id.* at 91.

She has not done so. As an administrative assistant in the Africana Studies Department starting in January 2017, Dikambi "report[ed] to Adams," who was chair of the Department until July 1, 2017 and assigned her tasks. CUNY 56.1 ¶ 21. According to both CUNY and Adams, however, he did not have the power to fire or demote Dikambi, reduce her salary or benefits, or transfer her to another position at any time during her employment. CUNY 56.1 ¶ 21; Adams 56.1 Resp. ¶ 171; Decl. of Donald Gray ¶ 6 (declaration by College's Labor Designee, Donald Gray, stating that "the most Dr. Adams could have done was recommend or make a request to [HR] that a certain action be taken"). Dikambi does not dispute that assertion. Instead, she argues that Adams was her "immediate supervisor" and he "had the power to alter the terms and conditions of her employments [sic], including, but not limited to, creating a hostile work environment, discouraging complaints about his behavior to Human Resources, and manufacturing substandard performance evaluations," Pl. 56.1 Resp. (CUNY) ¶ 21, and because he had the "authority to recommend, request or otherwise orchestrate Ms. Dikambi's termination or other disciplinary action." Pl. Opp. to CUNY at 18. In support of those assertions, Dikambi relies solely on her own deposition testimony that she interpreted Adams' remark that she would be "fucked" if he didn't "do anything for [her]" to mean that "if he didn't write a positive evaluation, I would be let go." Dikambi Tr. at 350–51. But the vicarious liability standard under Title VII is an objective one, and her own belief that Adams had the ability to take employment action against her is insufficient to create a dispute

of material fact. *See Del Villar v. Hyatt Hotel Corp.*, No. 19-CV-10891 (JMF), 2022 WL 2316205, at *6 (S.D.N.Y. June 28, 2022).

To be clear, there may well be instances where evidence of an individual's ability to make a recommendation that would necessarily or likely result in a tangible employment action causing "direct economic injury," *Bentley*, 935 F.3d at 91, could support the conclusion that he was a "supervisor" for vicarious liability purposes. For example, in *Preuss v. Kolmar Laboratories, Inc.*, 970 F. Supp. 2d 171 (S.D.N.Y. 2013), Judge Seibel denied a defendant-employer's summary judgment motion where the plaintiffs' allegedly harassing supervisor testified that their employer "approved every recommendation" that he made about whether to terminate employees, "without asking [] any questions about the specific employee recommended." *Id.* at 187. The court thus concluded that the plaintiffs had "sufficiently alleged a claim for hostile work environment … for which [the defendant company] may be held liable." *Id.* But the record here is devoid of evidence that a recommendation from Adams would have held that kind of weight. Indeed, insofar as there is any evidence in the record about the weight any recommendation from Adams would have had, it suggests the opposite: Gray, the College's Labor Designee, testified that Dikambi, as an employee with "permanency status," would have had "to receive three annual notifications that [her] job is being eliminated" before being let go, with the "first letter being three years out, second two years, basically informing that each of those three years informs how close you are to being out of a job." Gray also stated that Dikambi had not received any such notices as of the end of 2016, immediately before her transfer to the Africana Studies Department. Klein Decl. Ex. H at 22–24.

In sum, to qualify as Dikambi's supervisor, Adams had to have been authorized "to take *tangible employment actions* that could *inflict direct economic injury*." *Bentley*, 935 F.3d at 91

(emphasis in original). Dikambi has presented no evidence that Adams was empowered to do so. Accordingly, she has failed to raise a triable issue of fact as to Adams' status as her "supervisor" for the purposes of liability under Title VII.

### B. Whether CUNY Took Sufficient Remedial Action

Next, Dikambi argues that CUNY is vicariously liable for Adams' conduct because it failed to take "immediate and appropriate corrective action" in response to Dikambi's complaints. Pl. Opp. to CUNY at 20. The Court again disagrees.

The Second Circuit has held that "[w]hen a 'co-employee'"—as distinct from a supervisor—is alleged to have engaged in harassing activity, the employer will generally not be liable unless it "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013). Title VII, however, "does not mandate that an employer take any particular remedial action, let alone take the plaintiff's preferred remedial action" in response to a complaint of harassment. *Halkitis v. New York City Dep't of Educ.*, No. 19-CV-11753 (JMF), 2022 WL 392911, at *4 (S.D.N.Y. Feb. 9, 2022) "Rather, [the remedial action] should be sufficiently calculated to end the harassment" and "[e]ven a mere written warning can be an appropriate response if it conveys the message that further harassment will not be tolerated." *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 176 n.30 (E.D.N.Y. 2015) (quoting *Wahlstrom v. Metro-N. Commuter R. Co.*, 89 F. Supp. 2d 506, 526 (S.D.N.Y. 2000)). The "reasonableness" of an employer's response "depends among other things on the gravity of the harassment alleged." *Summa*, 708 F.3d at 125 (quoting *Torres v. Pisano,* 116 F.3d 625, 638 (2d Cir.1997)).

The record evidence establishes that CUNY responded promptly and proportionately to each of Dikambi's complaints. Within a few days of Dikambi's initial complaint about Adams' "outburst" on May 30, 2017, Singh, as HR Director, convened a meeting during which he told Adams that his behavior was inappropriate and Adams subsequently apologized to Dikambi for his profanity. Dikambi then went on leave until July 31, 2017, by which time Adams was no longer chair of the Africana Studies Department. On the day of her return, she emailed HR and the Department of Public Safety about a "hyper-dysfunctional work environment" and "even … xenophobic and sexist remarks." Klein Ex. J. That email prompted an August 10, 2017 interview with the Department of Public Safety and a determination (with which she agreed) that she did not need a security escort, and on September 20, 2017, Dikambi was offered an "immediate transfer" out of the department. Particularly in light of the fact that Dikambi acknowledges she had little interaction with Adams—and no inappropriate communication at all—between Adams' June 5, 2017 apology and her transfer out of the Africana Studies Department, the Court cannot conclude that CUNY failed to take remedial action necessary to end the alleged harassment she reported about Adams' "vulgar language" and "disparaging and inappropriate comments[.]" *Id.; see, e.g., Hoag v. Fallsburg Cent. Sch. Dist.*, 279 F. Supp. 3d 465, 481 (S.D.N.Y. 2017) (finding employer not liable under Title VII where harassers were warned that "comments were inappropriate, [and] the comments ceased"); *Toyama v. Hasaki Rest., Inc.*, No. 13-CV-4892 (AKH), 2014 WL 7234602, at *4 (S.D.N.Y. Dec. 18, 2014) (concluding employer was not vicariously viable where he reprimanded harasser and rescheduled alleged victim and harasser's shifts); *Haggood v. Rubin & Rothman, LLC*, No. 14-CV-34L (SJF) (AKT), 2014 WL 6473527, at *21 (E.D.N.Y. Nov. 17, 2014) (holding that defendant-employer satisfied its "remedial obligation to address and end the

harassment" where it reprimanded the offending employee, who then "refrained from uttering any … offensive language" for nearly two years).

Next, on February 9, 2018, more than four months after Dikambi was transferred out of the Africana Studies Department, she emailed Montalban, the Director of Compliance & Diversity, to complain that Adams had "handed her a piece of paper" the day before, specifically, the paper they had previously worked on together, "to pressure [her] and make [her] feel extreme discomfort." Leal Decl. Ex. A at 3. Montalban scheduled an appointment with Dikambi for February 22, 2018, at which time Dikambi filled out a complaint form alleging "sexual harassment." Dikambi argues that CUNY did not investigate her complaint quickly enough. But CUNY issued no-contact orders the following day, which Dikambi chose not to sign until March 1, 2018. CUNY 56.1 ¶ 57. Moreover, Dikambi's complaint, which stated that she "*will* bring xenophobic sexist remarks description that have occurred in past," was incomplete, and contained no specifics about any of Adams' remarks—or any mention of an alleged sexual assault. *Id.* ¶ 55; Klein Decl. Ex. N (emphasis added). After Dikambi failed to follow up on her report, CUNY contacted her again on May 31, 2018, to request further information. When she did not respond, CUNY once again asked her on September 18, 2018 whether she intended to submit additional information.

Finally, in an email on September 24, 2018, Dikambi reported for the first time that "[she] declined [Adams'] sexual advances prior to [her] joining the Africana Department" in January 2017. CUNY 56.1 ¶ 62. CUNY then interviewed her on October 5, 2018 and interviewed Adams and other witnesses shortly thereafter. CUNY 56.1 ¶¶ 63–66. Compliance & Diversity Deputy Director Leal completed a report summarizing the investigation on February 8, 2019, concluding that Dikambi's allegations of "almost ten years of sexual harassment" were "not supported by the preponderance of the evidence," but that some of her allegations that Adams made comments about

her appearance were. *Id*. ¶¶ 67, 68; Leal Decl. Ex. A at 18–20. CUNY then required Adams to participate in remedial training. CUNY 56.1 ¶ 70. Notably, between February 8, 2018 and the completion of the final report one year later, there is no evidence that Dikambi and Adams had any contact. The record thus makes clear that CUNY "conducted a prompt investigation as soon as [Dikambi] complained, took immediate steps to minimize contact between [her] and [Adams], and effectively put a stop" to Adams' behavior. *Small*, 2021 WL 1226979, at *21.

In determining whether CUNY responded appropriately, the Court considers the seriousness of the conduct that Dikambi reported in each of her complaints together with CUNY's response. *See Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998) (explaining that courts consider "the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment"); *see also Willis v. Cnty. of Onondaga*, 710 F. App'x 47, 49 (2d Cir. 2018) (defendant-employer could not be held liable for conduct that "it did not have knowledge … occurred"). For example, although Dikambi told Compliance & Diversity Director Montalban in their August 9, 2017 conversation that, prior to Adams' June 2017 apology for his "outburst," Adams had made insulting remarks about her appearance, including commenting on her lipstick and her weight, Leal Decl. Ex. A, she had not yet reported that Adams had engaged in unwanted sexual advances or any physical touching, CUNY 56.1 ¶ 49. Indeed, it was not until September 2018 that she reported that Adams had made unwanted sexual advances prior to January 2017, at which time CUNY promptly began an investigation. Moreover, after CUNY responded to Dikambi's initial May 2017 complaint, she and Adams had almost no interactions aside from the February 8, 2018 incident when Adams dropped her paper on her desk.

In sum, the record makes clear that "[e]ach complaint that [Dikambi] brought directly to [CUNY's] attention was dealt with quickly and in proportion to the level of seriousness of the event." *Summa*, 708 F.3d at 125. "An employer's remedy need not necessarily expel the harasser from the work environment to be effective, but rather it should be sufficiently calculated to end the harassment." *Stepheny v. Brooklyn Hebrew Sch. for Special Children*, 356 F. Supp. 2d 248, 266 (E.D.N.Y. 2005) (citation omitted). Because "no reasonable juror could find that [CUNY] … knew of the harassment but did nothing about it,'" *Toyama*, 2014 WL 7234602, at *4 (quoting *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 63 (2d Cir.1992)), CUNY cannot be held vicariously liable for Adams' alleged misconduct. Dikambi's remaining Title VII claim against CUNY must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, CUNY's motion for summary judgment is granted, and Adams' motion for summary judgment is denied.[3] No later than September 30, 2023, Adams and Dikambi shall submit a joint letter proposing trial dates. The Clerk of Court is respectfully directed to terminate Dkts. 151, 161, and 165.

SO ORDERED.

Dated:        September 5, 2023
              New York, New York

Hon. Ronnie Abrams
United States District Judge

---

[3] In light of the Court's ruling, it need not decide CUNY's motion to preclude evidence.